**Harry B. CORSON**

**v.**

**UNITED STATES of America.**

**Civ. A. No. 39425.**

United States District Court
E. D. Pennsylvania.
Sept. 16, 1969.

Joseph G. Feldman, Philadelphia, Pa., for plaintiff.

Joseph Ritchie, Asst. U. S. Atty., Philadelphia, Pa., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER.

MASTERSON, District Judge.

This is an action brought under the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq., wherein the plaintiff claims that the government is liable for damages caused by the allegedly negligent insertion and removal of an intracath tube from his arm while the plaintiff was a patient at a Veteran's Administration Hospital for the purpose of undergoing surgery for a gall bladder condition. Additionally, the plaintiff claims that the government is liable for the allegedly negligent post-operative treatment given to the arm. After a trial without a jury, upon pleadings and proof, this Court makes the following:

### FINDINGS OF FACT

(1) The plaintiff, Harry B. Corson, was, at the time of the operation, 41 years old, married and had three children. He had been employed since May 20, 1964, by Mr. T. A. Smith, Jr., who was an industrial painting contractor. Before entering the hospital, the plaintiff was earning $4.025 an hour ($.17½ of which represented welfare payments).

(2) The plaintiff was admitted to the Veteran's Administration Hospital in Philadelphia, Pennsylvania, on October 1, 1964, complaining of severe abdominal pain and vomiting. There was nothing wrong with his left arm or hand.

(3) The medical staff at the Veteran's Administration Hospital diagnosed the plaintiff's complaints as resulting from the poor functioning of his gall bladder.

(4) An operation to remedy this condition was performed on October 21, 1964. The surgical team was headed by Dr. David B. Lucchino, to be assisted by Dr. Oscar Serlin and Dr. Jerome I. Cohen. Miss Olga Capetanidis and Mr. William Connell were the nurse anesthetists. Miss Helen Williams was the surgical nurse and Miss Mildred Ellis was the instrument nurse. All of the above were employees of the Veteran's Administration Hospital.

(5) Since it was necessary for the gall bladder operation that a catheter be inserted in the plaintiff's left arm, the plaintiff was brought to be anesthetized. Beginning at 8:20 A.M., the plaintiff was put under the effect of a "light" anesthesia by Miss Capetanidis.

(6) In this "light" state, the plaintiff "bucked" when a tube was placed down his throat.

(7) Mr. Connell, who was to insert the catheter, was unaware of the plaintiff's reaction to the intubation and was not so advised by Miss Capetanidis.

(8) Had he known that the plaintiff had "bucked" upon intubation, thus alerting him to the fact that the patient was under a "light" anesthesia, Mr. Connell would have inserted the intracath differently and would have taken more precautions to prevent the plaintiff from moving while the intracath was being inserted.

(9) A tourniquet was placed slightly below the plaintiff's elbow to allow the veins in his arm to become prominent. Mr. Connell then firmly grasped the plaintiff's left hand, bending it at the wrist to obtain a favorable angle, and began to insert a # 14 gauge metal needle into a vein on the back of the left hand. A minimum of back flow of blood was noted.

(10) Thereafter, the polyethylene catheter was inserted through the inside sleeve of the needle. The intravenous flow was then hooked up but would not drip. At this point, the patient began to move and resist.

(11) The # 14 gauge needle was removed and it was noted that the polyethelene tubing was cut where it extended from the needle, leaving a 4¾ inch piece of catheter in the patient's arm.

(12) The catheter was broken as a result of the plaintiff's movements in his "light" condition.

(13) A tourniquet was reapplied to the left arm to prevent the possibility of the broken catheter's flowing through the blood stream and causing further complications.

(14) X-rays were taken of the left arm which located, in a two-dimensional plane, the presence of the section of catheter in the forearm of the dorsal aspect.

(15.) Dr. Lucchino made a transverse incision in the dorsum of the left arm in an attempt to locate the catheter that had shown up in the x-ray. This incision was made approximately one hour after the severed tube had been discovered.

(16) Failing to locate the catheter, Dr. Lucchino made two more transverse incisions in areas farther up the dorsum of the left arm. Investigations in these areas having proved unsuccessful, Dr. Lucchino again probed the initial incision and located and removed the broken piece of catheter from the subcutaneous tissues.

(17) The three incisions were then closed with 4-0 cotton, after a cut down was placed in a suitable vein on the dorsum of the hand. The wounds were dressed and an ace bandage was applied.

(18) The patient was then prepared for his gall bladder operation, which was performed without incident. The patient left the operating room at 1:15 P.M.

(19) When the patient was returned to his room, his left arm was elevated by placing it on a pillow. Ice bags were applied to the left hand and forearm to reduce the swelling.

(20) The day after the operation, October 22, the patient complained of pain in his left arm. Ice bags were applied and his arm remained elevated on the pillow. His hand color was "good" and his dressings were dry.

(21) On October 24, the nurse's notes observe that the patient's arm was "red and [the] hand was quite puffy."

(22) On October 26, the nurse noted that there was "serous sanguinous drainage" from the plaintiff's left arm and warm soaks were applied.

(23) Again, on October 28, there was "seeping serous material" from each of the incisions on his left forearm and continuous warm soaks were applied.

(24) On October 28, Dr. William S. Klein, Chief of Staff at the Veteran's Administration Hospital, reported that no further action was indicated regarding the plaintiff's left arm.

(25) On October 29, the nurse's notes tell of a "yellow seepage from incisions on [the] arm". Warm compresses were continually applied in an attempt to stop the seepage. Dr. Cohen reported the patient "doing well" and recommended his discharge.

(26) Between October 22 and October 29, the patient was visited daily by Dr. Lucchino.

(27) On October 30, 1964, the plaintiff was released from the hospital by Dr. Edward Whelan, a member of the hospital's staff. The plaintiff was scheduled to return on November 3, 1964 for a check-up.

(28) On November 3, 1964, Dr. Whelan examined the plaintiff and discharged him. Although the left arm was swollen and "ooze" was flowing from the incisions, Dr. Whelan did not consider these symptoms significant enough to note on the hospital's medical records.

(29) For approximately one month after discharge from the hospital, the drainage from the incisions on the left arm continued. The plaintiff's left arm and hand were swollen during this period and, as instructed by the medical staff at the hospital, he applied warm soaks. The drainage ceased when the incisions healed within 5 to 6 weeks after the operation.

(30) Two or three months following his surgery, the plaintiff began to complain of numbness in his fingers, associated with burning and continued weakness of function. He attempted to alleviate this malady with aspirins.

(31) Due to the limited use of his hand, the plaintiff was unable to resume

158

work at his previous employ as an industrial painter. This job required the use of both hands in that a painter must climb ladders with one hand and grasp his painting utensils in the other, as well as requiring strength and agility in working on scaffolds above the ground.

(32) The plaintiff worked for four to five days at a trucking firm unloading parcels, but his weakened arm and lack of work prevented continued employment.

(33) During his extended recuperative stage, the plaintiff spent much time at a used car lot with friends. He normally just "killed time" there but also performed errands which garnered him about $5.00 a week. He sought no other employment.

(34) During this period, the plaintiff's family was supported by contributions from his mother-in-law, as well as from earnings from his wife and children.

(35) On the advice of his attorney, the plaintiff went to see Dr. James M. Hunter, a hand specialist, on January 6, 1966, which was approximately 14 months after the plaintiff was discharged from the Veteran's Administration Hospital. Although the plaintiff could have sought the assistance of the Veteran's Administration Hospital, he did not return to their clinic after being discharged on November 3, 1964.

(36) Examination showed that the power of plaintiff's left hand was decreased by approximately 50% when compared with his right hand. Sensory

testing showed that the median nerve was damaged. Dr. Hunter concluded that the plaintiff was suffering from a severe "median nerve compression syndrone" (carpal tunnel syndrome) and recommended operative treatment in the near future.

(37) On the basis of the plaintiff's statements and his own examination, Dr. Hunter opined that the 6–8 weeks of inflammatory edema, which the plaintiff experienced after the incisions in his arm were made, caused the thickening and adhesions of soft tissues which resulted in compression of the median nerve.

(38) The plaintiff was admitted to the Jefferson Medical College Hospital on March 22, 1966. On March 24, Dr. Hunter performed an operation which ressected the adhesions and constrictions of the epineurium around the median nerve.

(39) Post-operative treatment proceeded without complications, and the plaintiff was discharged from the hospital on March 26, 1966.

(40) The first week after the operation, the burning sensation in the plaintiff's arm subsided.

(41) The plaintiff had several follow-up visits with Dr. Hunter, and approximately 12 weeks after the operation, his left arm and hand were functioning normally.

(42) The total cost of the carpal tunnel operation was $726.15. Itemized, the charges were:

Jefferson Hospital ----------------------------------$281.15
Electromiograph ------------------------------------ 15.00
Anesthesiologist ------------------------------------ 35.00
Dr. Hunter:
     Operation ----------------------------------300.00
     Initial exam ---------------------------- 35.00
     Follow-up exams ----------------------- 60.00

$726.15

(43) The plaintiff was capable of gainful employment as of June 19, 1966.

(44) Plaintiff found a job with Standard Press Steel Company and began work on April 19, 1967. His average pay (base plus incentive) was $138.40 for a 40 hour week.

(45) Between June 19, 1966, and April 19, 1967, the plaintiff made only one other attempt to seek employment and that was as a driver at a manufacturing plant. The plaintiff did not desire to return to painting because he had developed a fear of having to work from heights.

(46) Damages for loss of earnings total $12,438.60. This figure reflects the amount the plaintiff could have earned between January 1, 1965 (the date he would have been fully recovered from his gallbladder operation) and June 19, 1966 (the date at which the plaintiff's hand was restored to allow gainful employment) for a 40 hour work week at the initial rate of $4.025 an hour. Salary and fringe benefit increases granted to union painters during this period have been reflected in the above figure.

(47) Damages for pain and suffering experienced by the plaintiff are assessed at $3,500.

(48) The total damages as assessed above are $16,664.75.

## CONCLUSIONS OF LAW

(1) This Court has jurisdiction over the subject matter (28 U.S.C. § 1346(b)) and the parties.

(2) All of the medical personnel at the Veteran's Administration Hospital were employees or agents of the United States Government and, at all times, were acting within the scope of their office or employment.

(3) The employees of the Veteran's Administration Hospital were negligent in not advising Mr. Connell that the plaintiff was in a "light" condition.

(4) The failure to warn Mr. Connell was the proximate cause of the catheter being broken off in the plaintiff's arm.

The resulting surgery to remove the catheter and the post-operative care given to the surgical incisions were the proximate cause of the carpal tunnel syndrome which plagued the plaintiff.

(5) The defendant is liable for all damages resulting from the catheter's breaking and lodging in the plaintiff's arm.